### JOHNSON v. CLYDE S. S. CO. et al.

(District Court, E. D. New York. March 6, 1914.)

SEAMEN (§ 29*)—DEATH OF SEAMAN—NEGLIGENCE.

In a libel to recover compensation for the death of a seaman alleged to have been drowned by stepping into an open space between a barge and a wharf and falling into the water, as he was assisting in carrying timber from the barge to the wharf, evidence *held* insufficient to show negligence on the part of the steamship company by which decedent was employed.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 186, 188–194; Dec. Dig. § 29.*]

In Admiralty. Libel by Olivia H. Johnson, as ancillary administratrix of Walter Johnson, deceased, against the Clyde Steamship Company and another. Dismissed.

Beals & Nicholson, of New York City (William J. Martin, of New York City, of counsel), for libelant.

Armstrong & Brown, of New York City (Pierre M. Brown, of New York City, of counsel), for respondents.

CHATFIELD, District Judge. The libelant is the mother and administratrix, etc., of one Walter Johnson, who was drowned on the morning of July 10, 1912, at pier 38, North river. Johnson lived in Baltimore with his mother, and was brought from Philadelphia, in company with other colored men, during the day of July 9th, to take the place of certain striking stevedores at the Mallory Line piers. The co-

defendant, the Clyde Steamship Company, seems to have had nothing to do with the matter in any way, and as to this defendant the libel should be dismissed, but, under the circumstances, without costs. Johnson does not seem to have been acquainted with any of the colored men who came from Philadelphia in this party, except with a cousin, one Jones, who had been working with him in Philadelphia. Neither of these young colored men had any familiarity with boats or stevedoring, and, according to Jones' statement, were hired to work in handling freight with small trucks.

At pier 38, upon the night in question, the steamship Alamo of the Mallory Line was lying on the south side of the outer end of the pier, bow in, and with her forward discharging port or gangway near the end of the shed or covered structure upon the inner half of the pier. A second discharging gangway or cargo port toward the stern and near the outer end of the pier was also in use by the gang of stevedores, who were all taken to this pier from another pier of the Mallory Line, early in the evening of July 9th. These stevedores were carrying the cargo of the Alamo upon the open end of the pier, under the direction of two foremen, one of whom was inside the vessel, directing the work, at each end of the cargo space. A third foreman was superintending the piling of the cargo upon the dock. This cargo consisted of timbers of large lengths and sizes (dimension lumber) and of railroad ties from southern ports. The large sticks of timber required the services of several stevedores at each end of the timber, supporting it by a cross-piece, or in some instances rolling the back end of the timber when upon the dock by means of a hand truck. Each of the men in the gang was given a brass check with a number, and the record shows that the check given Johnson (No. 75) was not turned in by any of the other work-men, and Johnson is admitted to have disappeared before daybreak the following morning. A straw hat identified by the cousin, Jones, was found floating in the water upon the south side of the pier around 4 o'clock a. m., and some days afterwards the body was reported by the police, and sent by the Mallory Line to the mother in Baltimore.

The certainty of the death and the approximate time of the accident are therefore not in dispute. The manner or cause of death presents an issue of fact as to the allegation of negligence on the part of the steamship company. The witness Jones testified that one of the fore-men (whom he later substantially identified as the outside foreman stevedore), finding that the gang contained more men than were necessary to bring the timbers from the hold of the vessel and pile them upon the dock, called some of the gang to one side and picked out Johnson and Jones, who were working together, and set them to work upon one of the lighters alongside the dock upon the north, carrying plank from the lighter to the dock. He describes these plank as being of considerable length, and indicates that they were some 10 or 12 inches in width and 2 or more inches thick. But he distinctly testifies that they were not railroad ties nor square timber, and that he saw no ties or large sticks of timber upon this lighter in the place where he was working. He testifies that a number of other stevedores were also taken by this foreman and put to work upon other lighters upon the north side of the pier, but further inshore. But his testimony about

what these men did and where they were working cannot be of great accuracy in any event, for Jones and Johnson, the decedent, had made but one trip to the pier and returned to the lighter, picked up another plank, and started for the pier when the accident happened.    Jones states that the deck load upon the lighter was above the surface of the wharf or dock, but that the rail or deck of the lighter was below the wharf, and that he and Johnson were carrying the plank in front of them, one being at each end with his arms around the end of the plank, holding it against his body.    Jones says that as they reached the edge of the deck load next to the wharf and attempted to step upon the deck or rail of the boat, his foot failed to find a resting place, but that he threw the plank in front of him, and, giving a shove with his other foot, jumped or scrambled upon the dock.    He heard some slight cry or exclamation from Johnson, and when he turned around the plank was lying upon the dock, but Johnson had disappeared.    He states that he found upon examination that the lighter had moved away from the dock, leaving space enough between her side and the dock, and also space enough under the face of the dock, so that Johnson had disappeared between the two.

The lighters had been moored the night before in such manner as to allow for the rise and fall of the tide.    The testimony shows that the tide does not run strongly under the pier, and if the lighter had moved away from the dock, it would indicate that the tide had turned and in rising had allowed some further slack upon the lines.    It further appears that the lights upon the wharf consisted of two arc lamps elevated over the open part of the dock, giving, as Jones and the other witnesses testified, sufficient light to work by upon the dock, but casting a shadow from the piles of lumber and the dock itself upon the spaces behind or below those objects.

Jones testifies that he immediately notified the foreman after his cousin disappeared, that no great effort was made to find his cousin, that his statement that Johnson was drowned was ridiculed, and that it was not until the straw hat was found about 4 o'clock in the morning that any policeman appeared, and that search under the dock was made. He testifies that the foreman in question did use a lantern from one of the boats, but thinks that this occurred at the time of the 4 o'clock search, and that he had in the meantime gone to one of the other piers, through the sheds upon the wharves, borrowed some paper, and written a letter to Mrs. Johnson, notifying her of the death of her son. This letter was received in Baltimore the next day, and the police blotter, as well as the testimony of the patrolman, indicates that the first notice to the police of which any record is shown or testimony given was not until around daylight in the morning.

Jones testified that both he and Johnson gave notice when they were employed that they knew nothing about boats, and that when they were put to work upon this pier, they received no instructions other than what to do with and how to carry the large pieces of timber.    He testifies that when taken to the lighter by the foreman, he and his cousin were told only to carry the planks and pile them upon the wharf, and that no warning or instruction was given them about the danger present in the dark shadows at the side of the wharf, but, on the contrary, that

they were sent in ignorance and uninstructed across what is alleged to have been a dangerous place, to carry plank in a way directed by the foreman, and without having furnished sufficient light to enable them to use proper care for their own protection.

The company have called the three foremen who were in charge of the work, and all of them deny having set any of the colored stevedores at work upon any of the lighters along the north side of the pier. Another steamer had been inside of the Alamo unloading into the covered pier, and, so far as it was traced and as shown by the record produced upon the trial, the lighters along the north side of the pier were being loaded with railroad ties and large timber, and none of the cargo from any of these lighters was being unloaded, nor was the Alamo or any other steamer at the pier that night receiving cargo. The two foremen who were on the vessel deny any knowledge whatever of the occurrence until they heard that a man had been drowned, except that the foreman, Thumler, who was in charge of the stern gangway of the vessel, testifies that around midnight, as he came across the dock, he though he saw a stevedore with a straw hat lying upon the stringpiece on the north side of the pier, and that at different times he had been compelled to wake up or hunt out some of the colored stevedores who were trying to sleep or loaf. On this particular occasion he said nothing to the man with the straw hat, as he was occupied with some other duty at the time, but that in a few moments he met the witness Jones sauntering around from behind a pile of lumber, and that Jones told him in a casual fashion that his cousin was drowned. This witness testifies that nothing more was seen of the stevedore who had been lying upon the stringpiece, wearing a straw hat, but that later, when the decedent's straw hat was found, this witness remembered that occurrence, and from this incident arose the defense that the decedent had fallen overboard while asleep.

The outside superintendent denies having set any of the men to work upon the lighter, or that any of the occurrences happened as described by Jones, but, on the contrary, says that when Jones gave notice, between midnight and 1 o'clock, that his cousin was drowned, a search had been made over the sides of the pier with a lantern taken from one of the barges, and that nothing could be seen. He also testifies that the police were called at that time, and denies that he ignored or disregarded the statements of Jones, and also testifies that no planks or small lumber were placed upon these lighters or taken from the Alamo that night. He states that no cargo of any sort was removed from the lighters, and the respondent has produced a sheet showing the lighter layout of the Alamo after her arrival upon the 3d of July, 1912. This sheet was produced after the policeman (who said that he was called around 5 o'clock in the morning, and who testified that the outside foreman [identified by Jones] had then been looking under the pier itself with a lantern from one of the barges) stated that Jones pointed out a lighter, next but one to the outer end of the pier, called the Charlotte, as being at that time alongside of the place where the accident occurred. There was no evidence of any sort to indicate that the boats had been shifted, and the lighter layout, Exhibit 8, contains three lots of dimension timber and ties placed on the Charlotte, all of which came

from the Alamo. No plank or small lumber, so far as the records of the cargo show went on the lighter.

It is urged by the respondent that no cargo would be removed from the lighters without the knowledge of persons who were checking up the amount of cargo being placed upon these lighters, that none of them were being used for bringing cargo to the pier; that the captains or men in charge of these lighters had stopped work for the night; and that no possible reason existed for taking stevedores upon the lighters and directing them to remove cargo. Jones' testimony as to seeing the other men at work was not definite, and if he and Johnson were set to work first, and only carried two plank, it is evident that he could not have seen much as to what the other men were doing. Jones told a credible, straightforward story, and all of the attendant circumstances as to which he differed from the witnesses for the respondent would seem to bear out his statement, while the discrepancies in the testimony are generally upon the side of the company. Thus we have on the one hand a plausible and more or less corroborated statement of events, told by a witness who would ordinarily be believed by any court or jury, and certainly the burden of proof has been sustained by the libelant as to the general narrative of events. When we consider the exact manner in which Johnson fell overboard, a slightly different situation is presented. The letter put in evidence by the attorney who first mentions the statements of Johnson is to the effect that the steamship company failed to provide reasonable and ordinary protection upon one of its boats, by which a young man was "precipitated" into the water and drowned. The attorney who received this letter in New York, and who also talked with the Baltimore attorney, in correspondence with the steamship company, referred to a "collision" of the boat with the dock. This was explained upon the trial to be a misinterpretation of the word "precipitated" above referred to; but it is difficult to see how the accident could have been so described if Jones had already told the detailed story about carrying the plank and falling through a space between the boat and the pier, as a result of a lack of warning and lack of light to enable Jones and Johnson to see where they were stepping. This in a negative way fails to corroborate Jones and does not bear out his statement upon the trial that Johnson came to his death through carrying out orders of a foreman, who put him at work in a dangerous place, without warning him as to the danger, or without providing lights to make the danger obvious to an inexperienced man. On the issue, therefore, as to whether the respondent is liable for negligence, or that negligence was shown, it is impossible, for several reasons, to hold that the libelant has sustained the burden of proof.

Jones testifies that the boat was away from the pier, and that neither he nor Johnson found this out upon the first two trips. The accident did not happen through unfamiliarity with boats, in the sense that Jones and Johnson did not know how to step from a boat to a wharf, nor from any danger involved in carrying the end of a plank over an open space. Those were obvious dangers as to which no instruction need be given. Nor would the company be negligent in not warning Jones and Johnson to avoid stepping into the water off the boat. That again would be obvious even to a person unfamiliar with

boats. The only possible ground of negligence would be in failing to call attention to the way in which the boats were moored, or to point out and make plainly visible the precise location of the rail of the lighter alongside the dock. So, assuming the men to be working as we have said, we must determine whether Jones, by failing to get his foot upon the rail, caused Johnson to lose his balance, or whether Johnson also did not know and could not see where he was stepping, and attempted to stand upon the open space between the boat and the dock, or whether Johnson may have stumbled over something upon the deck of the lighter, which in turn caused Jones to overstep and fail to put his foot upon the side of the boat, and thus in turn to precipitate Johnson in such a way that Johnson fell overboard and was drowned, or that any one of a number of different accidents might have happened. Even Jones did not see Johnson fall, but merely knew that Johnson was carrying the timber, and that Johnson with some outcry disappeared just as Jones himself had some difficulty in stepping upon the wharf. The danger of climbing from a rocking boat up to a wharf and of not stepping in the dark off the boat cannot be classed as a risk directly connected with navigation, nor would it seem that warning need be given by a foreman to workmen to be careful about such a matter. It is not in any sense instruction connected with the peculiar kind of work.

The court is unable to see that there was any negligence on the part of the company or that there was any carelessness on the part of any one except Jones and Johnson. The danger could not be considered a trap, nor, with the lights arranged as they were, throwing the side of the lighter into the shadow under the pier, would it seem to be negligence on the part of the company to expect that even inexperienced men would use care to see where they were stepping.

It is true that, if a light had been placed over the edge of the pier, the danger of falling might have been less, but these men were not compelled to undergo any unknown danger by the order of the respondent, nor were they excused from avoiding obvious danger on their own part by a general instruction to do work which might involve a danger that they should see for themselves. When we couple the failure to show responsibility on the part of the company with the improbability of the witness Jones' story upon the one matter as to which he is not corroborated, it is impossible to hold that the libelant has sustained the burden of proof, and the libel must be dismissed as to the Mallory Line.

The Clyde Line had nothing to do with the pier or work on the night in question, and is admittedly out of the case in any event.